**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| Laura J. Muller,<br><br>   Plaintiff,<br><br>vs.<br><br>South Carolina Department of Mental Health,<br><br>   Defendant. | Case No:<br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

COMES NOW Plaintiff Laura J. Muller (hereinafter "Plaintiff") and alleges the following in her Complaint against the South Carolina Department of Mental Health (hereinafter "Defendant"):

**PARTIES**

1. Plaintiff is a citizen and resident of Columbia, South Carolina.

2. Defendant is a South Carolina state government agency with its principal place of business in Columbia, South Carolina.

3. Plaintiff seeks more than $75,000 in damages as a result of Defendant's acts and omissions as alleged herein.

4. This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §2000e-5(f)(3) (Title VII of the Civil Rights Act), 28 U.S.C. §1331 (federal question), and 28 U.S.C. § 1367 (supplemental jurisdiction).

5. Venue is proper in this District, as the most substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District, and Defendant does business relating to the events and omissions alleged herein in this District.

## FACTUAL BACKGROUND

6. Each and every allegation set forth above is reiterated as if fully set forth herein.

7. Defendant hired Plaintiff as an employee on or around October 19, 2015.

8. Plaintiff worked for Defendant as a BHA-B Behavioral Health Assistant from October 19, 2015, until approximately August 11, 2016.

9. Beginning in December 2015 until her termination in August 2016, Plaintiff was forced to endure a hostile work environment and sexual harassment at the hands of male co-worker Johnny Gillard (hereinafter "Gillard").

10. Gillard worked for Defendant as a BHA-C Behavioral Health Assistant a position he held for approximately 20 years.

11. Plaintiff reported Gillard's inappropriate conduct to her supervisors, including, but not limited to, Della Hart, Regina Robinson, Tammy Cleveland, and "Ms. Shonda."

12. Della Hart works for Defendant as a Registered Nurse.

13. Regina Robinson works for Defendant as a Nurse Manager.

14. Tammy Cleveland works for Defendant as a Director of Nursing.

15. The initial reporting was made to Della Hart, Plaintiff's immediate supervisor.

16. Hart spoke with Regina Robinson about the issue, who then spoke with Plaintiff and referred her to Ms. Shonda to investigate.

17. Ms. Shonda read Plaintiff's notes on the issue and decided it was something she could not handle.

18. Two months later, Plaintiff also discussed the harassment with Cleveland.

19. On or about March 24, 2016, and at any other time Gillard was going to be away from Plaintiff for a period of days, Gillard approached Plaintiff at work and said he was going to

go home and "just think about [Plaintiff]." Plaintiff indicated to Gillard that this was inappropriate, saying Gillard should be thinking of his wife and not her.

20. By April 2016, Gillard subjected Plaintiff to repeated, severe, and pervasive sexual harassment. This harassment took place at work during work hours, and often took place in front of Plaintiff's co-workers.

21. On or about April 13, 2016, Gillard harassed Plaintiff while she was working. Gillard touched Plaintiff, and when she protested, he repeatedly attempted to stick his finger in her mouth.

22. On or about April 16, 2016, Gillard again approached Plaintiff and engaged in an inappropriate, unwelcomed, and sexually-explicit conversation. Gillard told Plaintiff all the men at work guessed Plaintiff was a lesbian. Gillard then offered Plaintiff $200 to have sex with another woman, asking to see the other woman "eat and blow in [Plaintiff's] p---y [slang for vagina]."

23. Plaintiff asked Gillard to stop, but Gillard refused.

24. Gillard again asked if he could pay Plaintiff to have sex with another woman in front of him. Gillard did not stop talking until Plaintiff showed him a picture of her male friend.

25. On or about the morning of April 26, 2016, Gillard touched Plaintiff's legs while she was attempting to work.

26. Plaintiff told Gillard to stop.

27. LPP Donna Thomas saw Gillard touching Plaintiff's legs.

28. During lunch on April 26, 2016, Gillard approached Plaintiff and tried to unfold her crossed legs.

29. Plaintiff pushed Gillard away and told him to stop.

30. Gillard then moved his head up and down in a sexually-explicit manner, as if he was looking over her and lusting after her.

31. Plaintiff walked away from Gillard.

32. Later on April 26, 2016, Gillard again approached Plaintiff and engaged in an unwelcome, inappropriate, and sexually-explicit conversation. Gillard told Plaintiff that all her female co-workers wanted him because he had money and that they had a bet on who would sleep with him first.

33. Gillard went on to tell Plaintiff that he does not sleep with women at work because "they don't look clean." Gillard said he would only want Plaintiff and one other woman at work to "suck [his] penis."

34. Gillard offered Plaintiff money to suck his penis.

35. Plaintiff did not reply.

36. Later on April 26, 2016, Gillard asked Plaintiff to not tell anyone about his request for her to suck his penis for money.

37. Gillard then proceeded to ask Plaintiff if she had any friends who would suck his penis for $200 to $500.

38. Plaintiff said, "No."

39. On April 26, 2016, Plaintiff reported Gillard's conduct to a case manager.

40. This case manager told Plaintiff to document Gillard's actions in order to protect herself.

41. In response to Plaintiff's report of Gillard's behavior, Defendant did not take any corrective action or seek to remedy the situation in any way.

42. On or about April 27, 2016, Gillard told Plaintiff that he was going to the doctor and expressed concern that he would be put on a higher dosage of medicine for his high blood pressure. Gillard told Plaintiff that a higher dosage would "mess with his manhood" and he could not live if he could not have sex.

43. Also on or about April 27, 2016, Gillard told Plaintiff he would love to see her have sex with a female co-worker named DaTasha Buckmon.

44. Plaintiff told him to be quiet, but Gillard kept talking until a client approached and asked him a question.

45. Before he left, Gillard tried to put $500 in Plaintiff's pocket, an amount of money Gillard consistently referenced when asking if Plaintiff would have sex with him or have sex with another female in front of him.

46. Also on or about April 27, 2016, Gillard attempted to pull Plaintiff's pants down, saying he wanted to see what color panties she was wearing.

47. Plaintiff slapped Gillard's hand and told him to stop.

48. Gillard continued to try to look down Plaintiff's pants until a nurse told Gillard to leave Plaintiff alone.

49. After Gillard tried to pull down Plaintiff's pants, Gillard told Plaintiff he has a friend willing to do sexual favors for him in exchange for money.

50. Plaintiff told Gillard she did not want to know this information.

51. On or about April 28, 2016, Plaintiff was in the lunch room when Gillard entered. A lunch lady offered Gillard some of her remaining juice. Gillard told Plaintiff he does not drink behind women because "y'all do all that stuff with y'all mouth."

52. In addition to the above-described incidents, Gillard repeatedly told Plaintiff unsolicited information about the size of his penis and his sexual appetite.

53. Gillard told Plaintiff a particular story about him cheating on his wife when she was out of town, claiming the other woman had a seizure while sleeping with him because of the size of his penis.

54. Gillard also repeatedly talked about Plaintiff's female co-worker, Priscilla, in a sexually explicitly manner, stating she "suck[s] a penis like a vacuum."

55. On May 6, 2016, a dining hall assistant asked Gillard what he was going to do about his headaches, which had kept him out of work for two days. Gillard said, in a sexually-suggestive manner, that Plaintiff knew what he needed to do to get rid of his headaches.

56. Plaintiff asked Gillard to stop.

57. On that same day and still in the dining hall, another co-worker asked Gillard how he was going to deal with his stress headaches. Gillard whispered a veiled threat to Plaintiff, saying he would get rid of everyone who stressed him out.

58. Later on May 6, 2016, Robinson asked Plaintiff to come to her office after Plaintiff was done in the dining hall.

59. While in Robinson's office, Plaintiff told Robinson of Gillard's inappropriate behavior.

60. Plaintiff explained to Robinson that she did not tell someone sooner because knew that Gillard had been reported for sexual harassment in the past and gotten away with it without recourse. Plaintiff also voiced her concern that management would not respond appropriately because everyone likes Gillard, and Defendant had employed him for many years, while Plaintiff had worked for Defendant for less than one year.

61. In their meeting, Robinson admitted there had been an incident of sexual harassment involving Gillard several months prior.

62. Plaintiff then went to see Ms. Shawna and told her about Gillard's inappropriate behavior. Plaintiff let Ms. Shawna read the notes she had made about the incidents.

63. After reporting Gillard for sexual harassment, Plaintiff was in her car when Gillard pulled up behind her, blew his horn, and asked why Plaintiff was there.

64. Plaintiff was scared and intimidated by Gillard, so she reported the incident to Robinson.

65. Robinson sent Plaintiff to another area for lunch that day.

66. Robinson assured Plaintiff that Gillard would not be allowed to come back to the work area until after he met with her. Robinson indicated to Plaintiff that she would tell Plaintiff when Gillard was back so that Plaintiff could leave without encountering him.

67. However, Gillard returned to the area where Plaintiff was before meeting with Robinson, without warning by Robinson that Gillard was returning.

68. After Gillard approached her again, Plaintiff sought out Robinson, who then reassigned Plaintiff to another area for the remainder of her shift.

69. The continued incidents with Gillard, coupled with Robinson's continued ineffectiveness in responding to these incidents, left Plaintiff feeling scared, anxious, and depressed.

70. Plaintiff was so emotionally disturbed from the harassment and Defendant's ineffective response thereto that she was forced to take off work for several days.

71. Another female co-worker contacted Plaintiff while she was on leave and informed Plaintiff that Gillard had also sexually harassed other women at work, including repeated incidents of asking women to sleep with him for money and exposing his penis to them.

72. This female co-worker indicated that these events were reported to supervisors, but Defendant still took no appropriate corrective action against Gillard.

73. After returning to work, Plaintiff was assigned to a different work area.

74. As soon as she was moved to her new work area, which was known to be less desirable, Plaintiff's co-workers treated her with hostility. Plaintiff's co-workers were quick to undercut her, constantly voiced their doubts about Plaintiff's abilities, and were consistently disrespectful and rude to Plaintiff.

75. On or about May 26, 2016, Plaintiff was written up when she explained that she already understood the responsibilities of the job.

76. On or about June 5, 2016, Plaintiff received a call from a DaTasha Buckmon. The co-worker indicated that others at work knew Plaintiff reported Gillard's harassment and that Plaintiff's reassignment was meant to punish Plaintiff for reporting the harassment and causing trouble for Gillard.

77. The co-worker suggested Plaintiff get a lawyer because Robinson intended to terminate Plaintiff because she reported Gillard.

78. Even after being assigned to a different work area, Plaintiff constantly feared she would run into Gillard at work.

79. This caused Plaintiff to suffer severe anxiety and depression. She was constantly on edge and had to hold back tears while at work. Plaintiff's was unable to sleep, and she lost her appetite.

80. The stress caused Plaintiff to take approximately three days off work.

81. On or about June 7, 2016, Tammy Cleveland called Plaintiff and requested doctors' notes to explain Plaintiff's absence from work. Cleveland also questioned Plaintiff's choice of doctors.

82. On or about June 8, 2016, Plaintiff again received a call from Cleveland and Ms. Shawna requesting doctors' notes to explain Plaintiff's absence from work.

83. Cleveland told Plaintiff that if she did not provide doctors' notes for the three days she missed, Plaintiff would be forced into an involuntary resignation.

84. Plaintiff told Cleveland and Ms. Shawna that she would have her doctor fax a note to them.

85. Plaintiff got off the phone with Cleveland and Ms. Shawna in order to talk with her doctor, who noticed how upset she was and told Plaintiff he would get Defendant a letter explaining Plaintiff's intermittent absences from July 11, 2016, until August 8, 2016.

86. On or about June 14, 2016, Plaintiff received a call from her co-worker Shonda Hayes ("Hayes").

87. Hayes told Plaintiff that Human Resources had instructed her not to contact Plaintiff and that all the paperwork relating to the complaints against Gillard had been lost.

88. On or about August 2, 2016, Defendant denied Plaintiff's leave request. Plaintiff was advised that she did not qualify for leave because she had not been there a year.

89. Upon information and belief, other similarly situated workers received paid leave at that time while Plaintiff did not.

90. On or about August 11, 2016, Defendant accused Plaintiff of falsifying a document and subsequently discharged Plaintiff.

91. On or about December 12, 2016, Plaintiff submitted a charge of sex discrimination and retaliation to the South Carolina Human Affairs Commission.

92. On or about December 13, 2016, this charge of sex discrimination and retaliation was sent to the EEOC for dual filing purposes.

93. On September 27, 2017, the EEOC issued a Dismissal and Notice of Rights, indicating Plaintiff's right to sue.

## FOR A FIRST CAUSE OF ACTION
### (Sexual Harassment & Discrimination - Title VII of the Civil Rights Act of 1964, *et seq*., as amended)

94. Plaintiff repeats and realleges the paragraphs above as if set forth herein verbatim.

95. By its acts and practices alleged above, and by other and related acts and practices, Defendant has willfully deprived Plaintiff of equal employment opportunities guaranteed by law by unlawfully discriminating against her on account of her sex, with respect to the terms, conditions, and privileges of her employment, in violation of Title VII of the Civil Rights Act of 1964 and the South Carolina Human Affairs Law.

96. Plaintiff is a female and is therefore a member of a protected class.

97. At all pertinent times, Plaintiff was Defendant's employee and qualified for protection under Title VII of the Civil Rights Act of 1964 and the South Carolina Human Affairs Law.

98. Defendant is an employer as that term is defined under Title VII of the Civil Rights Act of 1964.

99. Based on her sex, Defendant subjected Plaintiff to a hostile work environment, subjecting her to hostile conditions at the hands of Gillard and others, as described above.

100. This abusive work environment included sexual physical contact by Gillard, sexually-explicit questioning, and sexually-explicit conversations and sexual advances.

101. This conduct towards Plaintiff was unwelcome and based on her sex.

102. Plaintiff was forced to endure this conduct on many occasions over the course of several weeks between March 2016 and May 2016. This conduct permeated Plaintiff's workplace and was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.

103. The conduct of Gillard and other co-workers is imputable to Defendant, as Defendant was aware of Gillard's prior bad acts, as described above, but failed to take any corrective action against Gillard. Further, Defendant was aware of Gillard's unwelcome conduct towards Plaintiff but did not take reasonable steps to address this problem.

104. Additionally, after Plaintiff reported the conduct, Defendant transferred her to an undesirable work assignment and shared Plaintiff's confidential complaint with her coworkers.

105. As a direct and proximate result of Defendant's subjecting Plaintiff to a hostile work environment, Plaintiff has suffered substantial damages, including, but not limited to, anxiety, loss of enjoyment of life, and other suffering, for which Defendant is liable.

106. Accordingly, Plaintiff is entitled to an award of compensatory damages, post-judgment interest, attorneys' fees and costs, injunctive relief, and such other and further legal and equitable relief from Defendant as deemed proper by this Court, to the fullest extent available under the applicable law.

**FOR A SECOND CAUSE OF ACTION**
**(Retaliation - Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended)**

107. Plaintiff repeats and realleges the paragraphs above as if set forth herein verbatim.

108. Plaintiff engaged in protected activity under Title VII, 42 U.S.C. § 2000e *et. seq.*, when she complained to her supervisors about the hostile work environment to which Plaintiff was subjected.

109. Thereafter, Plaintiff was subjected to discriminatory and retaliatory discipline, isolation, and other hostile treatment from approximately April 26, 2016, through approximately August 11, 2016, that would dissuade any reasonable worker from engaging in such protected activity. Defendant reassigned and ultimately terminated Plaintiff in retaliation for her opposition and reporting of Gillard's unlawful sexual advances on the job site, as described above.

110. Under the circumstances, there is a causal connection between the adverse action and Plaintiff's opposition to Defendant's practices, particularly given the temporal proximity between the protected activity and the adverse action. Plaintiff was transferred after she complained, and her treatment by her co-workers and supervisors grew worse thereafter, culminating in retaliatory discharge from her job.

111. Individuals who did not oppose discriminatory practices were not treated as poorly as Plaintiff and, in fact, received benefits without serving the one-year employment period required of Plaintiff to receive the same benefits.

112. Upon information and belief, the alleged reasons proffered by Defendant for this treatment of Plaintiff were mere pretext for unlawful retaliation under Title VII, 42 U.S.C. § 2000e *et. seq.*

113. Accordingly, Plaintiff is entitled to an award of compensatory damages, post-judgment interest, attorneys' fees and costs, injunctive relief, and such other and further legal and equitable relief from Defendant as deemed proper by this Court, to the fullest extent available under the applicable law.

WHEREFORE, Plaintiff, based on her Complaint set forth above, prays for the following relief: a jury trial on all causes of action set forth herein; that judgment be entered in her favor, and against Defendant on all causes of action; that she be awarded compensatory damages in an amount to be determined by a jury, but not less than an amount sufficient to compensate her fully for all damages she has incurred and will in the future incur, along with the loss of peaceful enjoyment of life, wages, and opportunity; for an award of punitive damages as determined by a jury in an amount sufficient to impress upon the Defendant the seriousness of its conduct and to deter similar conduct in the future; for an award of pre-judgment and post-judgment interest; and for such other and further relief as the Court deems just and proper.

        Respectfully submitted,

        __/s/ Stevens B. Elliott_____
        Stevens B. Elliott (#706)
        THE LAW OFFICE OF STEVENS B. ELLIOTT
        1417 Bull Street
        Columbia, South Carolina 29201
        Phone (803) 254-7980
        steve@elliottlawsc.com

        __/s/ Bryn C. Sarvis_____
        Bryn C. Sarvis (#10478)
        SARVIS LAW, LLC
        3424 Augusta Highway
        Gilbert, South Carolina 29054
        Phone (803) 785-5525
        bsarvis@sarvislaw.com

        **ATTORNEYS FOR PLAINTIFF**

November 1, 2017